UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MARIA ROSSANA AALA QUINIO,

                Plaintiff,

        - against -

RUSTICO AALA, and LERMA AALA,

                Defendants.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CV-4912 (PKC) (SB)

PAMELA K. CHEN, United States District Judge:

      In 1986, Defendant Rustico Aala ("Rustico"), then aged 42, raped his sister Maria Rossana Aala Quinio ("Plaintiff"), then aged 16, and impregnated her.  In 1987, Plaintiff gave birth to a child, who was placed for adoption immediately thereafter.  Plaintiff kept the rape and pregnancy a secret from everyone in her family – except her siblings – until 2009.  Rustico soon thereafter agreed to enter into a written contract ("the Agreement") with Plaintiff to compensate her with cash, a new car, a stake in his properties in the Philippines, and part of his retirement accounts.

      In 2015, Plaintiff filed this action alleging that Rustico and his wife Defendant Lerma Aala ("Lerma") (collectively "Defendants") breached the Agreement by failing to perform their contractual obligations.  The parties allege jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.  Before the Court is Plaintiff's motion for summary judgment in which she seeks a finding of liability against Defendants, specific performance of Rustico's obligation to convey to Plaintiff his properties in the Philippines and 40% of his retirement accounts, including a joint account shared with Lerma, and a declaratory judgment binding Lerma to the Court's decision.  For the reasons stated below, the Court grants in part and denies in part Plaintiff's motion for summary judgment.

## BACKGROUND

**I.      Relevant Facts**

Plaintiff was born on 1969 in the Philippines, and immigrated to the United States when she was fourteen. (Pl's. 56.1[1], Dkt. 103-21, at ¶ I-1.) At some time in August of 1986, Plaintiff[2] was raped by her brother Rustico. (*Id.* at ¶ II-1.) At the time, Rustico was forty-two years old and Plaintiff was sixteen. (*Id.* at ¶ II-3.) Plaintiff gave birth to a child on or about May 13, 1987. (*Id.* at ¶ II-4.) The child was subsequently placed for adoption. (*Id.* at ¶ II-5.) Plaintiff does not know if the baby was a boy or a girl. (*Id.* at ¶ II-6.) Plaintiff's two sisters, Yolanda and Marie, handled the hospital paperwork and bills. (Deposition of Maria Quinio ("Plaintiff Dep."), Dkt. 103-2, at 142.) Plaintiff alleges that for twenty-three years she only told her siblings about the rape and the baby, but did not tell her parents. (*Id.* at 109.) Plaintiff told her husband Jesus Quinio ("Jess"), whom she married in 1996, in early November of 2009. (*Id.* at 104.)

On November 5, 2009, Jess and Plaintiff's sisters, Mary and Marie, met with Rustico and Lerma to discuss the incident. (Pl's. 56.1, at ¶ IV-5.) At that meeting, Jess gave Rustico a letter written by Plaintiff in which Plaintiff discloses the rape and recounts her years of secrecy. (*Id.*) On November 15, 2009, Plaintiff wrote a letter to her family stating that Rustico raped her. (Amended Complaint, ("Am. Compl."), Dkt. 7, at ¶ 10.) On November 20, 2009, Plaintiff and

---

[1] "Pl's. 56.1" refers to Plaintiff's 56.1 Statement. (Dkt. 103-21.) Unless otherwise noted, a standalone citation to Plaintiff's 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to Plaintiff's 56.1 Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

[2] Plaintiff goes by the name "Susan" and is referred to as Susan in the deposition transcripts. (*Id.* at ¶ I-I.)

Rustico entered into the Agreement whereby Rustico agreed to compensate Plaintiff.  (Pl's. 56.1,

at ¶ IV-5.)  The Agreement consists of three sections, the first of which reads:

Term and Conditions:

1.      All your assets, property, inheritance and income in the Philippines will be given
        to me provide power of attorney stating all asset, property, inheritance and income
        transfer all rights and will to me, Mrs. Maria Rossana Aala Quinio.
        Provide this document before November 30, 2009 Mail to:
                Mrs. Rossana "Susan" Aala Quinio
                P.O. Box 8035
                Paramus, NJ 07653

        Failure to comply, I will file a legal suite of "Rape of a child and incest"

2.      Provide and surrender your U.S. passport to me. Provide this document before
        November 30, 2009 Mail to:
                Mrs. Rossana "Susan" Aala Quinio
                P.O. Box 8035
                Paramus, NJ 07653

        Failure to comply, I will file a legal suite of "Rape of a child and incest"

3.      Purchase a new vehicle of my choice on before May 1, 2010
        Failure to comply, I will file a legal suite of "Rape of a child and incest"

4.      Provide documentation regarding your retirement plan, forty percent (40%) of
        your retirement plan will be given to me, Mrs. Rossana "Susan" Aala Quinio
        provide power of attorney stating rights and modification of your retirement plan.
        Provide this document on June 7, 2010 at 12:00 NN, failure to provide this
        document, I will file a legal suite of "Rape of a child and incest"

5.      Provide lump sum damages that cause my life and suffering with the amount of
        $500,000 thousand dollars, see schedule of fee damages. A bank account number
        will be provided three days prior to schedule of dead line.

        i.      First payment of $70,000 dollars cash due on December 14, 2009
                at 12:00 NN, (drop off to be determined & coordinated) failure to
                provide on this amount, I will file a legal suite of "Rape of a
                child and incest"

        ii.     Second payment of $200,000 dollars on December 5, 2011 at
                12:00 NN, failure to provide this amount, I will file a legal suite of
                "Rape of a child and incest"

      iii.    Last and balance of payment with the amount of $230,000 dollars on December 3, 2012 at 12:00 NN, failure to provide this amount, I will file a legal suite of "Rape of a child and incest"

      The terms and conditions are not negotiable. Again, failure to comply on my terms and conditions, you will be persecuted to the fullest extent of the law. I will make sure with the help of my husband and in the name of our Aala sister's most specially our parents you will pay the price.

      Your youngest sister,
      Mrs. Rossana Aala Quinio
      Date: November 20, 2009

(Dkt. 103-7, at ECF[3] 1-2.) Plaintiff signed her name at the end of the first section of the Agreement. (*Id.* at 2.)

      The second section of the Agreement is a seemingly random collection of five blank forms from the Family Court of the State of New York: (1) Order to Show Cause (*id.* at ECF 3); (2) Summons (*id.* at ECF 4); (3) Order of Protection, setting forth general information about potential arrest and criminal prosecution (*id.* at ECF 5); (4) Notice to Respondent Parent(s) in Child Abuse or Neglect Cases (*id.* at ECF 6); and (5) Warrant of Arrest (*id.* at ECF 7).

      The third section is a one-page letter containing the signatures of both Plaintiff and Rustico. The letter states, *inter alia*:

      This letter is to inform you that you, Mr. Rustico Aala, signed and agreed "Confidentiality agreement" per my husband meeting with Mrs. Lerma Aala, Ms. Maria Aala and Mrs. Guanlao present last December 15, 2009 at your house at 1:07 pm, both parties and witnesses verbally agreed "confidentiality regarding the meeting discussed.["]

                    \*    \*    \*

      Read and Accepted by:
      I, Mr. Rustico Aala will comply with the terms and condition above no matter what happen and responsible to pay Mrs. Rossana "Susan" Quinio

---

[3] "ECF" refers to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

(*Id.* at ECF 8.)

On June 30, 2015, Plaintiff and Jess called Rustico and had a conversation in Tagalog. Jess taped the conversation, which Plaintiff's lawyer had translated and transcribed. (*See* 6/30/15 Transcript, Dkt. 103-11.) In that conversation, Rustico acknowledged (1) his intention to make payments to Plaintiff, but claimed he did not have the money; (2) his obligation to convey his properties in the Philippines; and (3) that he was seeking Plaintiff's forgiveness. (Pl's. 56.1, at ¶ IV-12.)

In total, Plaintiff claims that she is entitled to $1,172,000 in damages. (Dkt. 103-21, at 10-11.)

## II. Procedural History

Plaintiff filed her complaint in this action on August 20, 2015. (Dkt. 1.) The parties completed discovery on February 12, 2017. (Dkt. 65.) On March 24, 2017, Defendants moved to amend their answer to include a defense of mental incompetence as to Rustico. (*See* Dkt. 67.) On May 8, 2017, the Court granted Defendants leave to amend their answer. On May 10, 2017, Defendants filed an amended answer. (Dkt. 73.) On July 12, 2017, the Court held a *Daubert* hearing to determine the admissibility of the testimony of defense expert Dr. Sandlin Lowe regarding Rustico's alleged mental incompetence. On August 7, 2017, the Court precluded the testimony of Dr. Lowe, subject to Defendants submitting medical literature to support the doctor's opinions and testimony—which Defendants failed to do. On December 4, 2017, Plaintiff submitted her motion, seeking (1) summary judgment as to the breach of contract of claim; (2) to preclude Defendants from pursuing Defendants' affirmative defenses at trial; and (3) a declaratory judgment binding Lerma to the Court's decision. However, because neither party addressed the issue of whether the Agreement should be voided on public policy grounds, the Court requested supplemental briefing on that issue, which was completed on June 11, 2018. (Dkts. 107, 108, 109.)

## STANDARD OF REVIEW

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013) (quoting *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001)); *see also* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "Material" facts are facts that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 322). Once a defendant has met his initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and internal quotation marks omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## DISCUSSION

### I.   Legal Standards

In New York, settlement agreements must be construed "according to general principles of contract law." *Brodeur v. City of N.Y.*, No. 04-CV-1859 (JG), 2005 WL 1139908, at *3 (E.D.N.Y. 2005) (citing *Collins v. Harrison–Bode*, 303 F.3d 429, 433 (2d Cir. 2002)). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (internal quotation marks and citations omitted). "A party asserting breach of contract claim has [the] burden of proof to establish all elements of its cause of action." *Kaul v. Hanover Direct, Inc.*, 296 F. Supp. 2d 506, 523 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).

The "primary objective" in contract interpretation is to give effect to the intent of the contracting parties as revealed by the language of the agreement at issue. *Sayers v. Rochester Telephone Corp.*, 7 F.3d 1091, 1094 (2d Cir. 1993). Contractual language is ambiguous if it is susceptible to more than one reasonable interpretation. *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988). Ascertaining whether a contract provision is ambiguous is a threshold question of law for the court. *Sayers*, 7 F.3d at 1094. When making that threshold determination, the court must read the disputed provision within the context of the entire agreement and must safeguard against adopting an interpretation that renders another provision superfluous. *Id.* at 1095. A contract is not made ambiguous "simply because the parties urge different interpretations." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).

If the court determines that the provision is ambiguous, it must then determine whether there is extrinsic evidence regarding the parties' intent. *See Gallien v. Connecticut General Life Ins. Co.*, 49 F.3d 878, 884 (2d Cir. 1995). If such evidence is in the record, the contractual ambiguity presents a question of fact for the fact-finder. *Id.* If, however, the record does not

contain any evidence regarding the parties' intent, the ambiguity "presents not an issue of fact, but an issue of law for the court to rule on." *Williams & Sons Erectors v. South Carolina Steel*, 983 F.2d 1176, 1183–84 (2d Cir. 1993). If the ambiguity presents a question of law, the court should apply the well-established doctrine of *contra proferentem* and construe the ambiguity against the party who drafted the contract. *See Masella v. Blue Cross & Blue Shield of Conn.*, 936 F.2d 98, 107 (2d Cir. 1991).

## II.    Plaintiff is Not Entitled to Summary Judgment on Her Breach of Contract Claim

### A.    The Agreement is Ambiguous and Presents a Genuine Issue of Material Fact

As a threshold consideration, the Court must determine whether the Agreement is ambiguous as a matter of law. *See Sayers*, 7 F.3d at 1094. The Agreement is difficult to interpret because it is so poorly drafted. Plaintiff's husband, Jess, a non-lawyer, drafted the Agreement and, in doing so, apparently sought to translate contractual terms from Tagalog into English. (Deposition of Jesus Quinio ("Jess Quinio Dep."), Dkt. 103-6, at 23.)    As discussed, the Agreement is composed of three parts:  (1) a "terms and conditions" sheet; (2) a collection of blank Family Court forms; and (3) a signature page. The Agreement itself is replete with misspellings ("[f]ailure to comply, I will file a legal suite [sic] of 'Rape of a child and incest'"), ungrammatical and incoherent phrasings ("[p]rovide lump sum damages that cause my life and suffering with the amount of $500,000 thousand dollars"), unusual terms ("[p]rovide and surrender your U.S. passport to me"), and conflicting dates (stating on the signature page that the parties initially met to discuss the Agreement on December 15, 2009, but signed the Agreement on November 20, 2009)—all of which contribute to the Agreement's ambiguity. (Dkt. 103-7, at ECF 1-8.) In short, the Agreement is a muddled mess.

Nonetheless, the Court finds that based on the undisputed evidence—including the Agreement itself, Plaintiff's and Rustico's June 30, 2015 telephone conversation, and the

deposition testimony given in this matter—there existed consideration on both sides for the contract.[4]  For her part, Plaintiff promised her silence as consideration; for his part, Rustico promised money and other assets.  Though, as discussed next, the precise nature and scope of Plaintiff's promise of silence must be decided by the jury at trial, it is clear that she made a promise not to report Rustico's rape of her in exchange for money and other property.[5]

The Court finds that the precise nature of Plaintiff's promise under the Agreement is ambiguous as a matter of law because it can be reasonably interpreted in multiple ways.  *Sayers*, 7 F.3d at 1095 (a contract is ambiguous if it is susceptible "to more than one reasonable interpretation."); *Capital Dist. Enters., LLC v. Windsor Dev. of Albany, Inc.*, 861 N.Y.S.2d 816, 819 (3d Dep't 2008) (defining ambiguous contract provisions as ones that "provide a reasonable basis for a difference of opinion").  One way to interpret the Agreement is that Plaintiff agreed not to report the rape to law enforcement or other governmental authorities.  Another way to interpret the Agreement is that Plaintiff only agreed not to initiate a civil lawsuit.  A third way to interpret the Agreement is that Plaintiff will not tell *anyone*, including their parents (*see* Dkt. 103-7 at ECF 2 ("our parents . . . will pay the price")), about the rape.  Each of these promises could qualify as a form of consideration; the question is: which promise did Plaintiff make?  The Court discusses the bases for each of these interpretations of the Agreement.

With respect to the first interpretation, portions of the Agreement suggest that Rustico's non-compliance could result in Plaintiff going to law enforcement and seeking to initiate criminal

---

[4] In their amended answer (Dkt. 73), Defendants assert an affirmative defense that there was no consideration for the Agreement.  In their opposition to Plaintiff's motion, however, Defendants do not elaborate on the basis for this defense.

[5] Defendants will not be permitted to argue as a defense at trial that the Agreement lacked consideration.

prosecution against Rustico for the rape. Under each sub-part of the contract, the Agreement states, "failure to comply, I will file a legal suite [sic] of 'Rape of a child and incest'." (*Id.* at ECF 1.) This clause appears seven different times in the Agreement. Under the New York Penal Code, Rustico's alleged crime would be rape in the first degree. N.Y. Penal Law § 130.35(A)(1) ("A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [b]y forcible compulsion."). Similarly, on the second page, the Agreement states, "Again, failure to comply on my terms and conditions, you will be *persecuted* to the fullest extent of the law." (Dkt. 103-7, at ECF 2 (emphasis added).) Plaintiff's use of the phrase "persecuted to the fullest extent of the law"—despite her (or Jess's) seeming misspelling of the term "prosecuted"—implies that Plaintiff would initiate a criminal prosecution against Rustico in the event of a breach. Finally and most importantly, the second section of the Agreement consists of five blank Family Court forms that most notably include an arrest warrant and an order of protection with information about potential arrest and criminal prosecution.

With respect to the second interpretation, portions of the Agreement, including some of the same sections just discussed, suggest that Plaintiff intended only to bring a civil lawsuit in the event that Rustico failed to comply with the Agreement. The term "legal suite" (*id.* at ECF 1-2), even though it is misspelled, could refer to a civil, rather than criminal, proceeding. Although there is no specific cause of action for "rape of a child and incest," there is a cause of action for sexual battery, which would encompass Rustico's conduct. *See LB on behalf of PB v. Hines*, No. 15-CV-5238 (NSR), 2018 WL 1773138, at *3 (S.D.N.Y. Apr. 10, 2018) ("A claim of sexual battery is . . . the intentional wrongful sexual contact with another person without their consent."). Indeed, Plaintiff's language agreeing not to file a civil lawsuit could be adequate consideration for the contract. *See Sutton v. Shearson Hayden Stone, Inc.*, 490 F.Supp. 98, 103 (S.D.N.Y. 1980) ("It

has long been recognized that a bargained for promise to forbear from commencing a lawsuit to collect a debt is good and valuable consideration for a reciprocal promise to pay that indebtedness.") (citation omitted). Furthermore, the blank Family Court forms, such as the arrest warrant, could indicate that Plaintiff sought to bring an action in family court, a civil court, in the event that Rustico did not fulfill his obligations under the Agreement.

With respect to the third interpretation, the Agreement also suggests a blanket promise by Plaintiff not to tell anyone about the incident, since it suggests not only forbearance on initiating civil or criminal proceedings (*i.e.*, the public), but references family members as well, such as Plaintiff's and Rustico's "parents" (Dkt. 103-7 at ECF 2)[6]. Indeed, to the extent that Plaintiff refers to the Agreement as a "confidentiality agreement" (*id.* at 8), it could be construed broadly as consideration to guarantee complete non-disclosure.

Because the agreement is ambiguous as a matter of law, the Court must now determine "whether there is extrinsic evidence regarding the parties' intent." *Kliszak v. Pyramid Management Grp., Inc.*, No. 96–CV–0041E (SC), 1997 WL 627638, at *3 (W.D.N.Y. Oct. 1, 1997); *ABC Radio Network, Inc. v. Lens America, Inc.*, No. 97-CV-9467 (WHP), 1999 WL 771360, at *3 (S.D.N.Y. Sept. 28, 1999) ("Where the language used is ambiguous or unclear, a court may consider extrinsic matters, not to vary the terms of the contract but to explain, clarify or elucidate the ambiguous language.").

The Court concludes that, although there is some extrinsic evidence showing that Plaintiff's promise under the Agreement was not to file a civil lawsuit, there is not enough to resolve the

---

[6] Notably, after Rustico's alleged breach of the Agreement, Plaintiff told her story to the New York Post, who published an article on August 30, 2015. *See* Kathianne Boniello, *Woman Says She Was Raped, Impregnated by Brother*, N.Y. Post, Aug. 30, 2015, *available at* https://nypost.com/2015/08/30/woman-says-brother-raped-impregnated-her/.

outstanding issues of fact.  The extrinsic evidence comes from two exchanges during the deposition of Jess, the Agreement's drafter.  In the first exchange, Jess testified about the meaning of the phrase "Failure to comply I will file legal suite of a child and incest."  He stated the following:

"Q. Okay.

A. Failure to comply I will file legal suite of a child and incest. (In English.)

Q. So that phrase is your contribution to that paragraph?

A. Yes."

(Jess Quinio Dep., at 23.)  Then, Jess testifies that the phrase was a reference to a lawsuit:

"Q. Your testimony is that the phrase that "failure to comply will result" I am assuming lawsuit not law suite, correct?

A.  Yes, I had the wrong spelling."

(*Id.* at 24.)

In the second exchange, Jess testified that he never intended to go to the authorities and have Rustico arrested for his crime:

"Q. Sir, was that statement made by Rusty after you told him that you were going to try to have him arrested?

A.  I never said that I will have him arrested."

(*Id.* at 67.)

Although this evidence suggests that Plaintiff sought to punish Rustico's potential non-compliance with a civil suit, rather than a criminal prosecution or more general public disclosure, it does not clarify the ambiguity of the Agreement itself.  Amazingly, there is no evidence in the record that either Plaintiff's or Defendants' counsel inquired about the arrest warrant or other

Family Court forms that were attached to the Agreement.[7]   There is also no evidence about

Plaintiff's intended meaning of the phrase "persecuted to the fullest extent of the law."   The

unresolved ambiguity in the Agreement is fatal to resolution of the contractual dispute at issue at

the summary judgment stage.   *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182,

1992 (2d Cir. 1996); *Chase Manhattan Bank, N.A. v. Keystone Distrib. Inc.*, 873 F.Supp. 808, 811

(S.D.N.Y. 1994) (explaining that where "the resolution of the ambiguity hinges on such extrinsic

matters as the credibility of witnesses or documents or upon choosing one among several

reasonable inferences that may be drawn from such extrinsic evidence, a jury, and not a court,

should decide what meaning is to be ascribed to the contract").

　　　　The remaining ambiguity after consideration of the existing extrinsic evidence also means

that the Court should not apply the doctrine of *contra proferentem* to construe the ambiguity

against Plaintiff as the party who drafted the Agreement.   *Morgan Stanley Group Inc. v. New

England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000) ("If the court concludes that [a contract] is

ambiguous, then the burden shifts to [the drafter] to prove that its interpretation is correct: if

extrinsic evidence is available but inconclusive, the burden shifts at the trial stage[;] . . . in the

absence of extrinsic evidence, the burden shifts at the summary judgment stage"); *1070 Park Ave.

Corp. v. Fireman's Fund Ins. Co.*, 313 F. Supp. 3d 528 (S.D.N.Y. 2018) (noting that New York

applies the *contra preferentem* rule "only as a matter of last resort, after all aids to construction

have been employed but failed to resolve the ambiguities") (internal quotation marks and citation

---

[7] In this vein, the Court also notes that even though Defendants included an affirmative defense based on public policy in their amended complaint, they never made any arguments or introduced any evidence that the Agreement could be construed as threatening criminal prosecution—a potentially dispositive aspect of the case—*until the Court asked for supplemental briefing on this topic*.   Defendants' counsel not only failed to explore the public policy issue with respect to this contract, discussed *infra*, but also did not move for summary judgment on the basis of this affirmative defense or any of their other affirmative defenses.

omitted). Because the extrinsic evidence in this case is "inconclusive," the burden to prove that Plaintiff's interpretation of the Agreement shifts to the drafter at the trial stage, and not at the summary judgment stage. *Morgan Stanley Group Inc.*, 225 F.3d at 276.

In sum, the Court finds that the Agreement is ambiguous and presents a genuine issue of material fact, which precludes granting summary judgment to Plaintiff on her breach of contract claim.

### B.    Public Policy Concerns and the Need for a Special Verdict Sheet

Parties to a civil dispute have the right to chart their own litigation course, absent any affront to public policy. *Mitchell v. New York Hosp.*, 61 N.Y.2d 208, 214 (1984). Because any contract "essentially involves a bargained-for exchange between the parties[,]. . . . [a]bsent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." *State of N.Y. v. Wolowitz*, 468 N.Y.S.2d 131, 145 (1983). Nonetheless, "[t]he power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents." *Hurd v. Hodge*, 334 U.S. 24, 34–35 (1948) (declining to enforce racially restrictive covenant on public policy grounds); *1420 Concourse Corp. v. Cruz*, 521 N.Y.S.2d 429, 431 (1987) (finding that a voluntary stipulation of settlement will be upheld "unless public policy is affronted, i.e. where judicial enforcement of such an agreement would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense.") "To declare a contract unenforceable on public policy grounds, . . . courts must first determine that the public policy at issue is 'well defined and dominant.'" *Fomby–Denson v. Dep't of Army*, 247 F.3d 1366, 1375 (Fed. Cir. 2001) (citation omitted).

Even though the Court refrains from voiding the Agreement outright on public policy grounds because of the questions of fact discussed above, the Court discusses the public policy issues relating to the Agreement, as they will be relevant at any trial in this matter. Courts throughout the country have found that "the public policy interest at stake[,] the reporting of possible crimes to the authorities[,] is one of the highest order and is indisputably 'well defined and dominant' in the jurisprudence of contract law." *Id.* (citing *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983)); *Branzburg v. Hayes*, 408 U.S. 665, 696–97 (1972) (stating that "it is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy" and concluding that "[i]t is apparent . . . that concealment of crime and agreements to do so are not looked upon with favor"); *Lachman v. Sperry–Sun Well Surveying Co.*, 457 F.2d 850, 853 (10th Cir. 1972) ("It is public policy in Oklahoma and everywhere to encourage the disclosure of criminal activity"); *Baker v. Citizens Bank of Guntersville*, 282 Ala. 33, 39 (1968) ("[A] contract based upon a promise or agreement to conceal or keep secret a crime which has been committed is opposed to public policy and offensive to the law."); *Groening v. Nowlen*, 369 Mich. 28, 33 (1963) ("[A] contractual obligation, or a conveyance, based on a promise, expressed or implied, to refrain from instituting or pressing a criminal charge or to obtain the suppression thereof, is opposed to public policy and is invalid on the ground of illegality of consideration.").

In the event that a reasonable trier of fact were to determine that the Agreement intended to punish Rustico's non-compliance with potential criminal prosecution, the Agreement would be void for public policy reasons. The Court finds that the facts of this case correspond closely to those in *Cosby v. American Media, Inc.*, 197 F. Supp. 3d 735 (E.D. Pa. 2016). There, defendants Andrea Constand, Bebe Kivitz, Dolores Troiani, and several other individuals, a decade earlier,

had entered into a confidential settlement agreement with Bill Cosby, Jr. following allegations that he had drugged and sexually assaulted Constand at his home in Montgomery County, Pennsylvania. *Id.* at 737. When allegations against Cosby began to attract national attention, Constand allegedly disclosed information covered by the settlement agreement to criminal investigators, and gave interviews about the same to various news outlets. In response, Cosby sued to enforce the terms of the settlement. *Id.* at 739. The Court granted Defendants' motion to dismiss, finding that the settlement was unenforceable as being against public policy "to the extent that [it] purports to prevent its signatories from voluntarily disclosing information about crimes to law enforcement authorities." *Id.* at 742.

Here, the Agreement would be illegal if a jury were to find that Plaintiff promised to conceal information from law enforcement authorities about the rape in exchange for financial compensation. Contrary to Plaintiff's argument, it is immaterial that Plaintiff waited twenty-three years to initiate the Agreement, *i.e.*, long after the formerly applicable five-year statute of limitations for rape in the first degree had run[8]; an agreement to forbear prosecution does not lose its public policy implications after the statute of limitations has expired. *See generally* 6A Arthur L. Corbin, Corbin on Contracts § 1421, at 355-56 (1962). Like *Cosby*, the Agreement would be unenforceable to the extent that it would "purport[] to prevent its signatories from voluntarily disclosing information about crimes to law enforcement authorities." *Cosby*, 197 F. Supp. 3d at 742. Plaintiff's threat of criminal prosecution would amount to blackmail, which the Court cannot condone as a matter of public policy.

---

[8] At the time Rustico raped Plaintiff in August 1986, the applicable statute of limitations for the criminal prosecution of rape was five years. *See* NY Criminal Procedure Law § 30.10. The New York Legislature, however, changed the provision on June 23, 2006 to eliminate the statute of limitations for rape claims. 2006 Sess. Law News of N.Y. Ch. 3 (S. 8441) (McKinney's) (stating that a prosecution for "rape in the first degree . . . may be commenced at any time").

To address this issue, the Court will use a special verdict sheet at trial to determine whether the jury specifically finds that at least one of Plaintiff's obligations under the Agreement was not to alert law enforcement authorities about the rape, provided that Rustico made good on his part of the Agreement. The use of a special verdict sheet is necessary to prevent the possibility of a verdict in Plaintiff's favor that is based on a contract that should be void as against public policy. The Court will instruct the jury as to the applicable law, and the jury will be required to specify each of its unanimous findings as to whether Plaintiff agreed to forbear on speaking to law enforcement or seeking criminal prosecution in exchange for the financial compensation outlined in the Agreement. *See* Fed. R. Civ. P. 49 (authorizing court to require jury to return a special verdict only in the form of a special written finding on each issue of fact).

### C. Defendants' Affirmative Defenses

In her summary judgment motion, Plaintiff seeks to preclude Defendants from pursuing any of their affirmative defenses at trial.[9] The Court will address each of these affirmative defenses in turn.

#### 1. Defendants May Not Present a Duress Defense at Trial

Defendants seek to offer a defense of duress to show that Rustico was coerced into signing the Agreement.[10] In order to prove that an agreement was executed under duress, a defendant must

---

[9] In addition to the affirmative defenses from Defendants' amended complaint, Defendants also suggest that Rustico should not be bound by the Agreement because he did not read it. However, under New York law, parties who have signed a contract are under the obligation to first read it, and cannot avoid a contract's effects on the ground that they did not read or understand its contents. *Marciano v. DCH Auto Group*, 14 F.Supp. 3d 322, 330 (S.D.N.Y. 2014) (collecting New York cases). Thus, as a matter of law, Rustico's failure to read or understand the Agreement does not relieve him of the obligation to be bound by it. Additionally, the Court will consider limitations on Defendants seeking to elicit or offer evidence or testimony at trial about Rustico's failure to read the contract, since it is irrelevant and may confuse the jury. Fed. R. Evid. 403.

[10] Defendants offer separate defenses of duress and coercion. (*See* Dkt. 73, at 3.) The Court treats these defenses as the same for purposes of analysis. *See Playboy Enter. Int'l, Inc. v.*

prove that there was: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989). The defense of coercion (or duress) is stated only where the party resisting contractual enforcement can show that "a wrongful (unlawful) threat exists and, if it does, whether that threat went so far as to deprive the plaintiff of its free will (that is, take away the plaintiff's alternatives)." *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, No. 08-CV-11365 (RJH), 2010 WL 1257300, at *7 (S.D.N.Y. Mar. 31, 2010). A contract entered into under duress is voidable, not void.[11] *Citibank N.A. v. Real Coffee Trading Co. N.V.*, 566 F.Supp. 1158, 1163 (S.D.N.Y. 1983). "A voidable contract is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance." *Reid v. IBM Corp.*, No. 95–CV–1755 (MBM), 1997 WL 357969, at *7–8 (S.D.N.Y. Jun. 26, 1997) (quoting Restatement (Second) of Contracts § 7 (1981)). "[O]ne who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it." *Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15, 23 (2d Cir. 1974).

Here, Defendants may not present a duress defense because Rustico did not promptly disaffirm the Agreement. Instead, on June 30, 2015—approximately six years after the parties signed the Agreement—Rustico *affirmed* his financial obligations during a taped telephone conversation with Plaintiff and Jess. Rustico admitted that he was obligated to provide

---

*On Line Entm't, Inc.*, 00-CV-6618 (DGT), 2004 WL 626807, at *3 (E.D.N.Y. April 1, 2004) (noting that "the analysis for coercion and duress [is] the same").

[11] Grounds upon which a contract is voidable include fraud, duress, mental illness, intoxication, and infancy. *See Reid v. IBM Corp.*, No. 95–CV–1755 (MBM), 1997 WL 357969, at *10 (S.D.N.Y. Jun. 26, 1997).

compensation to Plaintiff, but stated that he was financially unable to do so. Rustico conceded that he was willing to pay Plaintiff $200 per month, but could not pay more. (Dkt. 103-11, at ECF 1) ("What am I going to pay with? [Unintelligible] . . . [W]ith meager pension. . . I'm going to give $200 a month.").) Later in the conversation, Plaintiff asks Rustico to transfer his property in the Philippines, one of the terms of the Agreement, and Rustico agrees. (*Id.* at ECF 3) ("I will have it [the property in the Philippines] transferred to your [Plaintiff's] name."). Rustico also asks for Plaintiff's "forgiveness" during the conversation. (*Id.* at ECF 6.) These statements indicate that Rustico intended to be bound by the Agreement, or at least parts of it. Even assuming that Rustico was under duress at the time he signed the Agreement, he did not "promptly" disaffirm his obligations under the Agreement and instead ratified them. Based on the undisputed facts, Rustico is not entitled to claim duress as a matter of law. Accordingly, Rustico will not be allowed to assert a duress defense at trial.

### 2. Defendants May Present an Incompetence Defense at Trial in Accordance with the Court's Previous *Daubert* Rulings

Defendants seek to introduce a defense that Rustico was incompetent at the time he signed the contract. On July 12, 2017, the Court held a *Daubert* hearing to determine the admissibility of the testimony of Defendants' proposed expert, Dr. Sandlin Lowe. (7/12/17 ECF Entry.) Following a hearing at which Dr. Lowe testified, the Court issued an order precluding his testimony, subject to Defendants submitting medical literature supporting Dr. Lowe's opinion that scans of Rustico's brain showed that his cognitive difficulties began eight to ten years prior to Dr. Lowe's examination of him. (8/7/17 ECF Entry.) Defendants failed to do so. Nonetheless, Defendants still seek to offer non-expert evidence in support of their incompetence defense, noting that the

Court suggested at the *Daubert* hearing that this evidence would be permissible during trial.[12] (Defs.' Opp'n, Dkt. 105, at ECF 9.)

The Court affirms its previous position that Defendants can introduce lay testimony in support of their incompetence defense. In contract disputes, the test for a person's mental capacity is whether the person's mind was "so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction." *Rudolf Nureyev Dance Foundation v. Noureeva-Francois*, 7 F. Supp. 2d 402, 416 (S.D.N.Y. 1998). In other words, the inquiry is whether the party was capable of making a rational judgment concerning the transaction in question. *See Harrison v. Grobe*, 790 F.Supp. 443, 447 (S.D.N.Y.1992) (citation omitted). The question of whether a person possesses sufficient mental capacity to sign a contract is an assessment within the ken of the average juror. "People who observe the [person] daily—family members, teachers, employers—are often most familiar with his or her capacity to cope with challenge and can illuminate for the jury" that person's ability (or inability) to enter into a contract. *People v. Cratsley*, 86 N.Y.2d 81, 87-88 (1995) (noting that lay witnesses may testify as to a party's capacity to make decisions and "the victim's ability to function in society").

The weight to be given to Defendants' lay witnesses' testimony is for the jury to determine. *Ortelere v. Teachers' Retirement Bd. of the City of N.Y.*, 25 N.Y.2d 196, 209 (1969) (noting that "a broad range of evidence including psychiatric testimony is admissible under the existing [evidentiary] rules to establish a party's mental condition. . . . In the final analysis, the lay jury will infer the state of the party's mind from his observed behavior as indicated by the evidence

---

[12] The Court stated at the *Daubert* hearing that Defendants can offer "other nonexpert evidence contemporaneous with the signing [of the Agreement] saying [Rustico] wasn't in his right [mind], and I assume the defendant himself may or may not testify that he didn't know what he was doing, to buttress some incompetence defense." (Transcript of 7/12/17 *Daubert* hearing, Dkt. 105-1, at 103:1-8.)

presented at trial."). Defendants' lay witnesses will be restricted to testifying regarding their observations of Rustico's behavior, as long as it is "rationally based on the witness's perception," Fed. R. Evid. 701(a), or "helpful to clearly understanding the witness's testimony or to determining a fact in issue," Fed. R. Evid. 701(b).

Plaintiff argues that the incompetence defense should be banned on the same grounds as the duress defense: that Rustico never disavowed the Agreement and instead ratified it during the June 2015 phone call. (Dkt. 103-22, at 12.) Plaintiff's argument, however, ignores the possibility that Rustico's alleged incompetence continued after the Agreement was signed and thus affected his decisions both at the time he signed the Agreement and when he ratified it six years later. Because Defendants allege that Rustico continuously suffered from mental incapacity, the jury must determine whether this condition impaired his ability to act reasonably at both points in time. *See Reid*, 1997 WL 357969, at *11 (finding that where plaintiff did not "allege that he continue[d] to suffer from the same undue influence, duress, mental disability or intoxication" after he signed the contract or that "these factors continued to impair his ability to act reasonably," plaintiff "accept[ed] the benefits of the transaction" and thereby "ratified it")

### 3. Defendants May Not Present Their Jurisdictional Defenses at Trial

Defendants seek to introduce two jurisdictional defenses: that the Court lacks subject matter jurisdiction over this case and that it lacks personal jurisdiction over Rustico. The Court rejects both of these arguments. Regarding subject matter jurisdiction, the Court notes that the parties are of diverse citizenship—Plaintiff lives in New Jersey and Defendants live in Queens, New York—and that Plaintiff seeks damages of $1,172,000, well over the jurisdictional threshold of $75,000. Defendants thus will not be permitted to present their subject matter jurisdiction defense at trial.

Establishing personal jurisdiction over a party "requires satisfaction of three primary elements": (1) procedurally proper service of process on the defendant; (2) a statutory basis for personal jurisdiction; and (3) the exercise of jurisdiction must be consistent with "constitutional due process principles." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012). The available statutory bases in federal courts are enumerated by Federal Rule of Civil Procedure 4(k). Rule 4(k)(1)(A) provides that "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *See also Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010) ("A district court's personal jurisdiction is determined by the law of the state in which the court is located."). Under New York law, domicile is a basis for general personal jurisdiction, which is established by determining whether a defendant intended to make New York his or her "fixed and permanent home." *Chen v. Guo Liang Lu*, 2016, 144 A.D.3d 735, 737, 41 N.Y.S.3d 517 (2d Dep't 2016).

Here, there is no dispute that Defendants were properly served. It is similarly undisputed that Rustico and Lerma live in Kew Gardens, Queens, which is part of the Eastern District of New York. Furthermore, Defendants raise no "constitutional due process" issues related to personal jurisdiction. Therefore, the Court finds that it has personal jurisdiction over Rustico, and Defendants will not be permitted to present their personal jurisdiction defense at trial.

### 4. Defendants May Not Present Their Statute of Frauds Defense at Trial

Defendants seek to introduce a defense that the Agreement is barred by the statute of frauds. The statute of frauds requires that certain agreements be in writing in order to be enforceable. Section 5-701 of New York's General Obligations Law, in which the statute of frauds is codified, provides, in relevant part:

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . . .

Under New York law, the "writing" necessary to satisfy the statute of frauds need not consist of one formal document. It may be "pieced together out of separate writings", not all of which need to be signed. *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 54 (1953). Although the signed writings need not contain all of the essential terms of the contract, they must clearly establish a contractual relationship between the parties, and refer to the same transaction as the unsigned writings. *Id.* at 54–56.

Based on the undisputed facts in this case, the Court finds that the Agreement satisfies the statute of frauds. Even though the Agreement consists of three sections—as opposed to one unified document—it establishes a contractual relationship between the parties. The Agreement and the June 2015 telephone conversation establish that the parties came to an agreement on most, if not all, of the terms. Accordingly, Defendants will not be permitted to present their statute of frauds defense at trial.

### 5. Defendants May Not Present a Statute of Limitations Defense at Trial

Defendants seek to introduce a defense that this case is time-barred by the statute of limitations. The Court disagrees. The Agreement was signed on November 20, 2009. Plaintiff brought this action on August 20, 2015, three months before the statute of limitations expired. *See* CPLR § 213(2) (stating a six year statute of limitations for breach of contract claims). Therefore, Defendants will not be permitted to use a statute of limitations defense at trial.

### 6. Defendants' Remaining Defenses

Based on the foregoing, Defendants will be allowed to present the following defenses or affirmative defenses at trial: (1) that the Agreement is a contract of adhesion; (2) that the Agreement is void as being against public policy; and (3) that there was an accord and satisfaction that modified the Agreement. Each of these defenses involves a question of fact that must be determined by a jury.

### III. There Is a Genuine Issue of Material Fact as to whether Plaintiff is Entitled to Specific Performance that Precludes Summary Judgment

Plaintiff seeks specific performance of the contractual terms, including conveyance of the properties in the Philippines and title to 40% of Defendants' joint retirement account. Because there are genuine disputes of material fact for the jury to resolve, it would be premature for the Court to address specific performance. Accordingly, Plaintiff's claim for specific performance is denied.

### IV. Plaintiff is Not Entitled to a Declaratory Judgment Binding Lerma

Plaintiff seeks to bind Lerma to a judgment declaring that Plaintiff is the rightful owner of 40% of Rustico's retirement plan, and 40% of any retirement benefits to which Rustico is entitled (including Lerma's retirement benefits held in the joint account at the UN Federal Credit Union). (Dkt. 103-22, at 24.) The Court denies this request because there remains a dispute issue of material fact relating to the retirement account. The Agreement states: "Provide documentation regarding your retirement plan, forty percent (40%) of *your retirement plan* will be given to me." (Dkt. 103-7, at ECF 1 (emphasis added).) Yet the parties dispute whether "your retirement plan" includes both Rustico and Lerma's retirement benefits. Plaintiff argues that the parties intended this phrase to include both Rustico and Lerma's retirement assets. Defendants argue that the Agreement as written makes no mention whatsoever of Lerma, and is not signed by her. This issue

of fact must be resolved by the jury.  The Court, therefore, cannot issue a declaratory judgment regarding Plaintiff's ownership of any retirement account covered by the Agreement at this time.

## **CONCLUSION**

For the reasons stated herein, Plaintiff's motion for summary judgment is granted in part and denied in part.  The parties will submit a joint pre-trial order by October 25, 2018, and the Court will schedule a pre-trial conference thereafter.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 25, 2018
      Brooklyn, New York